**James SIMS, Owner of Sims Enterprise,**

v.

**UNITED STATES DEPARTMENT OF AGRICULTURE, FOOD & NUTRITION SERVICE and the United States of America.**

**No. H–C–86–92.**

United States District Court,
E.D. Arkansas, E.D.

Jan. 5, 1988.

L.T. Simes, West Helena, Ark., for plaintiff.

Charles Banks, U.S. Atty. by Richard M. Pence, Jr., Asst. U.S. Atty., Little Rock, Ark., for defendants.

## MEMORANDUM OPINION AND ORDER

GEORGE HOWARD, Jr., District Judge.

This proceeding, in essence, is a review of a three-year disqualification of James Sims, owner of Sims Enterprise, a retail food store, from participating in the Food Stamp Program established pursuant to the Food Stamp Act, 7 U.S.C. § 2011 *et seq.*, for allegedly violating food stamp regulations—the acceptance of food stamps in payment for ineligible food items. After carefully scrutinizing the applicable facts and the law, the Court holds that the sanction of three years disqualification is unwarranted in law and without justification in fact and, therefore, the sanction imposed is arbitrary and capricious as fully discussed below.

### RELEVANT FACTS

Sims Enterprise is located in Marvell, Phillips County, Arkansas, and was authorized to participate in the food stamp program on February 10, 1984. Sims, a black male, purchased the store sometime in 1982 from a Chinese male who had operated this establishment for approximately forty-three (43) years, catering primarily to blacks, in this agriculture community, who constitute approximately 50% of the population.

This retail establishment, under the operation of Sims' predecessor, had a high rate of food stamp redemption. The United States Food and Nutrition Service (FNS), which administers the food stamp program concluded, after conducting a thorough investigation of Sims' predecessor, after manifesting some concern of the predecessor's high redemption rate, that the high rate of coupon redemption was not due to any abuse of the food stamp program, but because of depressed economic conditions in Phillips County, blacks had access to food stamps on a rather large scale.

Approximately seven months after Sims qualified to participate in the food stamp program, FNS found that Sims' food stamp business exceeded the average for the Phillips County area when compared with sev-

enteen other food stores. In other words, Sims' food stamp sales represented 60% or more of his expected monthly sales while other food stores' food stamp business in the area constituted approximately 20% of their monthly receipts. As such, a compliance investigation was conducted by FNS on September 19, 1984. Following this investigation, the following "warning letter" under date of October 1, 1984, was sent to Sims:

"This letter is to confirm the discussion of Food Program Specialist Rowena Buchanan with you on September 19, 1984. During the visit, Mrs. Buchanan discussed with you your unusually high rate of coupon redemptions. She pointed out to you that your redemption rate is much higher than that of other stores in your area. She also indicated our concern that this high rate might indicate the presence of violations of the Food Stamp Program Regulations in your store. You said that the high rate was due to attracting majority of the Black trade in town; carrying low-income preferred meats such as ham hocks, slab bacon, neck bones, also lunch meats sliced-to-order. You stated that the store had a history of being an ethnic store. Former owner had the store 43 years and he attracted the Black trade.

You furnished March through August 1984 total sales as $44,350, with 75% food sales and credit business as 10% of total sales.

You denied that any violations have occurred in the store. Mrs. Buchanan completely reviewed the regulations governing food coupon transactions with special emphasis on those which prohibit sales of ineligible items (Sections 271.2 and 276.-2(a)), payment of charge accounts with coupons (Section 278.2(f)), the exchange of cash for coupons (Section 278.2(d)). ..."

On February 6, 1985, Bobby J. Hood, officer in charge of the Little Rock FNS office, requested Joseph T. Turecky, Chief Compliance Management Section, Southwest Region, FNS, to conduct an investigation of Sims' store for possible food stamp violations. Pursuant to this request, an investigation was conducted between May 29, 1985, and June 18, 1985. Andrew Jackson, FNS investigator, made six visits during this period to Sims' store and on five occasions, made, purportedly, purchases of twenty-nine ineligible items with stamps. A clerk, Bertha Johnson, was responsible for two of these alleged transactions and Sims, the owner, was responsible for three.

The following is a schedule of both the ineligible as well as eligible items during the six visits made by Andrew Jackson:

1.  Transaction of May 29, 1985:

    Ineligible items [1]: 1–23 oz. bottle of clorox bleach, .71¢; 1–17 oz. box of super suds laundry detergent, .93¢; 1–14 oz. can of Comet cleanser, .55¢.

    Eligible items: 1–7½ oz. bag of potato chips, .99¢; 1–8 oz. box of saltine crackers $1.12; 2–5 oz. cans of vienna sausage, $1.38; 2–3¾ oz. cans of sardines, $1.58; 1–8 oz. jar sandwich spread, $1.05; 2–12 oz. cans of soft drinks, price unknown.

2.  Transaction of June 7, 1985:

    Ineligible items purchased, none.

    Eligible items purchased: 1–package of sliced cheddar cheese, $1.00; 3–1 oz. packages of saltine crackers, price unknown; 2–16 oz. bags of rice, $1.18; 4–3 oz. cans of potted meat, $1.56; 1–8 oz. jar of sandwich spread, $1.05; 2–6½ oz. cans of chunk light tuna, $2.70; 1–26 oz. box of salt, .35¢; 3–11 oz. cans of pork & beans, $1.20.

3.  Transaction of June 21, 1985:

    Ineligible items: 1–15 oz. bottle of pine sol, disinfectant, $1.69; 1–14 oz. can of Ajax cleanser, .55¢; 1–32 oz. bottle of clorox bleach, .71¢; 1–17 oz. box of super suds laundry detergent, .93¢.

    Eligible items: 1–8 oz. box saltine crackers, $1.12; 2–6 oz. packages of lem-

---

**1.** Ineligible items refused by the clerk were: 2–pouches of chewing tobacco, 1–20 oz. box of detergent; 1–box of soap pads; 1–bottle of bleach; 1–roll of bathroom tissue; 1–package of paper plates and 1–box of plastic forks.

on cookies, $1.00; 1–8 oz. jar of sandwich spread, $1.05; 2–5 oz. cans of vienna sausage, $1.38; 1–2 oz. jar of instant coffee, $1.98; 1–6 oz. non-dairy creamer, $1.50; 2–15 oz. cans of pork and beans, $1.00.

4. Transaction of July 3, 1985:

Ineligible items: 1–6¼ oz. can Gilette Foamy shaving cream, $2.39; 1–package of plates, $1.29; 2–boxes of forks, price unknown; 1–roll of Reynolds wrap, .69¢; 1–20 oz. box of laundry detergent, $1.51; 1–32 oz. bottle of clorox bleach, .71¢; 1–15 oz. bottle of sun pine cleanser, .92¢.

Eligible items: 1–48 oz. can of smoked sausage, $3.94; 3–11½ oz. cans of pork and beans, $1.20; 1–8 oz. jar of mayonnaise, .98¢; 1–18 oz. bottle of barbecue sauce, $1.59; 1–25 oz. box of cake mix, $1.39; 4–soft drink mixes, price unknown; 4–1 oz. packages of saltine crackers, price unknown; 2–7 oz. packages of duplex cremes, $1.00.

5. Transaction of July 10, 1985:

Ineligible items: 2–3 oz. pouches of Red Man's chewing tobacco, price unknown; 1–10 oz. can of Easy Off oven cleaner, $1.59; 1–20 oz. box of Tide laundry detergent, $1.44; 1–32 oz. bottle of clorox bleach, .71¢; 1–roll of bathroom tissue, .45¢; 1–15 oz. bottle of all purpose cleanser, $1.39; 1–14 oz. can of Ajax cleanser, .55¢; 1–package of six inch plates, .59¢.

Eligible items: 3–15 oz. cans of pork and beans, $1.50; 2–15 oz. cans of luncheon meat, $3.38; 1–8 oz. jar of sandwich spread, $1.05; 5–1 oz. packages of saltine crackers, price unknown; 5–instant drink mixes, .75¢; 2–bags of potato chips, price unknown; 5–3 oz. cans of potted meat, $1.95; 2–5 oz. cans of vienna sausage, $1.38; 1–16 oz. bag of rice, .59¢.

6. Transaction of July 18, 1985:

Ineligible items: 2–3 oz. pouches Red Man chewing tobacco, price unknown; 2–5 oz. bars of Dial soap, $1.50; 1–3 oz. tube of Colgate toothpaste, $1.76; 1–package of plates, .59¢; 1–box of forks, price unknown; 1–14 oz. can of Comet cleanser, .58¢; 1–bottle of Dawn washing detergent, $1.98.[2]

Eligible items: 3–cans of pork and beans, $1.20; 2–cans of spaghetti and meatballs, $1.96; 1–jar of nondairy cream, $1.50; 1–jar of instant coffee, $1.98; 1–bag of rice, .59¢; 4–cans of potted meat, $1.56; 2–boxes of macaroni and cheese dinner, $1.48; 1–box of cake mix, $1.49; 1–can of lunch meat, $1.59; 1–jar of sandwich spread, $1.05; 4–packages of saltine crackers, price unknown.

On January 8, 1986, defendant charged Sims with violation of the food stamp regulations for receiving food stamps for ineligible articles. Sims was requested to submit an explanation regarding the charges. On January 14, 1986, Sims advised FNS, by letter, that he had been operating the retail food establishment for approximately two years; that he was required to work another job in order to get his store on "its feet"; that he and his clerk, Bertha Johnson, "apparently have made careless violations, because of poor supervision" and promised to afford better supervision in the future and he would personally make certain that FNS regulations would be followed in the future.

On January 24, 1986, Bobby J. Hood, of the Little Rock, Arkansas FNS office, submitted a case summary of the charges pending against Sims to Grady Smithey, Director of Family Nutrition Programs. Mr. Hood recommended that Sims be disqualified from participating in the food stamp program and further stated that a civil money penalty was not warranted in the case. Significantly, Mr. Hood made the following comment in his case summary:

The investigative evidence indicates Mr. James Theodis Sims, owner, sold ineligible items on three occasions, and Mrs. Bertha Johnson, sold ineligible items on

---

**2.** Ineligible items refused consisted of: 1–box of detergent; 1–can of Royal Crown hairdressing; and 1–can of bug killer.

two occasions. _There were no refusals._ (Emphasis added).[3]

On July 7, 1986, Mr. Turecky determined that Sims "shall be disqualified" from participating in the food stamp program for a period of three years after making the following findings:

"B. JUSTIFICATION:

During the course of the investigation by the Compliance Branch, there were five clearly violative buys of ineligible items (two major items) conducted with a clerk and the owner. There were one complete refusal and two partial refusals. The two partial refusals were considered clearly violative because ineligible items constitute more than 30% of the items purchased. Compliance action had been taken with the firm, and a confirming letter was sent.

The appropriate period of disqualification is three years in accordance with Paragraph D, Section 1222 of FNS Handbook 318:

D. _Three–Year Disqualification._ Assign a three-year disqualification if the firm has had no previous sanction and the evidence shows that:

1. It was the firm's practice to commit violations such as the sale of common ineligible items in quantities usually found in a food firm transaction, and the firm had been previously warned of the possibility that violations were occurring and of possible consequences of violating the regulations;

C. COMPARABLE CASES:

Little Jim's Inc. #11, Oklahoma City, OK (DA03313)."

### DECISION

### I.

### CLEAR VIOLATIONS

FNS Handbook 318, Chapter 12—§ 1221(A)(2)(b) provides:

b _Quantity and Kinds of Items Purchased. The reviewer shall compare the quantity and types of ineligible items sold in each transaction, to the quantity and types of eligible items sold in the same transaction, as well as refusals in the same transaction._ Such a comparison will help the reviewer in judging whether that transaction was clearly violative or whether the ineligible items could easily have been sold without being noticed by the clerk. In the absence of a major ineligible item, or in the absence of comment(s) or action(s) by a clerk which clearly indicates that the clerk knew that some items were ineligible, and to be considered clearly violative, a transaction must consist of ineligible items sold comprising not less than 30 percent of the total number of items purchased. However, any transaction in which a major ineligible items is purchased alone, or with common ineligible items, shall be considered a clearly violative transaction, regardless of whether or not the 30 percent ratio is met. _In counting the number of items sold in a transaction, the reviewer should bear in mind that items of the same kind and brand are often sold in combination. In view of this, ineligible items of the same size and brand, sold in the same transaction, shall be counted as one item._ Thus, three bars of Brand X soap would count as one ineligible item, not three. This paragraph does not apply to tobacco or alcoholic products. (Emphasis added)

█ After carefully examining FNS computation resulting in a finding that the ineligible items in each transaction involved in the charges lodged against Sims, constituted more than 30%, when compared to the percentage of eligible items, the Court holds that the applicable regulation which sets out the procedure for determining whether a violation has taken place, by comparing the percentage of the ineligible items to the eligible items, was not followed. FNS in tabulating the number of

---

**3.** In recommending that a civil money penalty was unwarranted, Mr. Hood found that while there was no public transportation in the area, there were approximately two other grocery stores that stocked a large variety of staple foods within walking and driving distance for food stamp recipients who shop at Sims' store and as such, a disqualification of Sims store would not cause hardship to recipients in the area.

eligible items in each transaction counted items of the same kind and brand as a single item, i.e., sardines, vienna sausages and soft drinks, thus resulting in a difference of not less than 30% for the ineligible items when compared to eligible items in the respective transactions. The regulation expressly provides that ineligible items "of the same size and brand, sold in the same transaction shall be counted as one item." The regulation does not authorize eligible items to be computed in this manner. A recomputation in accordance with Section 1221(A)(2)(b) affords the following ratio of the ineligible items falling below 30% of the overall purchases:

| EXHIBITS | INELIGIBLE ITEMS | ELIGIBLE ITEMS | PERCENTAGE OF IN-ELIGIBLE ITEMS TO OVER-ALL ITEMS |
|---|---|---|---|
| A | 3 | 9 | 25% |
| B | 0 | 8 | |
| C | 4 | 10 | 28.5% |
| D | 7 | 17 | 28% |
| E | 8 | 26 | 23.5% |
| F | 7 | 21 | 25% |

(NOTE: In exhibits D and F paper plates and plastic forks constituted some of the ineligible items, however, under FNS regulations, such items are regarded as one item and not two in determining the ratio between ineligible and eligible items. In addition, under FNS regulations, the two pouches of tobacco in exhibits E and F alone are sufficient to constitute a "clear violation.")

Based upon the recomputation, the evidence established only two clear violations of the food stamp regulations as opposed to the Regional Director's finding of five clear violations. Under the regulations there must be at least four "clear violations" before a sanction requiring a disqualification of three years can be imposed. It is clear that the evidence demonstrates only two "clear violations" in this action.

## II.

## THE WARNING LETTER OF OCTOBER 1, 1984

FNS Handbook 318, Action on Suspicion of Violations, Section (720E(1)(D)(2) provides:

"The warning letter shall contain a review of the subjects discussed, a confirmation that the field office representative *expressed his or her suspicions* that violations may have been occurring...." (Emphasis supplied).

Section 750(B)(4) provides:

"... *Special emphasis shall* be given to those regulations dealing with the *al-leged or suspected* violations...." (Emphasis added)

The FNS representative did not "express her suspicions", in the warning letter of October 1, 1984, that violations may have been occurring within the context of the official charges lodged against Sims. The warning letter simply reminded Sims that the representative "discussed with [him the] unusually high rate of coupon redemptions. She pointed out to you that your redemption rate is much higher than that of other stores in your area. She also indicated our concern that this high rate might indicate the presence of violations of the Food Stamp Program Regulations in your store".[4] This Court is not persuaded that FNS's letter of October 1, 1984, was specific in the sense that FNS was *"suspicious"* that ineligible food items were being sold in violation of the Food Stamp Program.[5] The letter simply stated that "our concern that this high [redemption rate] might indicate the presence of violations of the Food Stamp Program Regula-

---

4. FNS's investigation of Sims' predecessor's high redemption rate disclosed that the store had a history of being an ethnic store—attracting low income black patrons.

5. The Random House College Dictionary, Revised Edition, defines the word Suspicion as: "The state of mind of a person who suspects.... Suspicion is the positive tendency to doubt the trustworthiness of appearances and therefore to believe that one has detected possibilities of something unreliable, unfavorable...."

On the other hand, Concern is defined as: "To relate to; be connected with; be of interest or importance to.... Concern implies an anxious sense of interest in, or responsibility for, something...."

tions in your store". The FNS representative, as well as the October 1, 1984, letter placed emphasis on those regulations prohibiting not only sales of ineligible items, but "payment of charge accounts with coupons", the exchange of cash for coupons and "the prohibition of multiple cash change transactions". FNS's regulation clearly states that "special emphasis *shall* be given to those regulations dealing with the *alleged* or *suspected* violations". It must be remembered that the facility in question has had a history over the years of high redemption rate of coupons under Sims' predecessor. It must be remembered also that one of the major purposes of the warning letter is to facilitate "voluntary compliance from the firm." Indeed, a vague and sweeping warning letter not only falls far short of the specificity contemplated in FNS's Handbook, but fails to lay the ground work or give adequate notice to foster the "voluntary compliance" that FNS seeks to promote. Moreover, given the fact a sanction, as in the instant case, resulting in a disqualification of three years is a rather extreme penalty, the warning letter, at the very least, should designate the area of concern as precisely as possible. *See, Plaid Pantry Stores, Inc. v. United States,* 612 F.Supp. 680 at 687 (D.C.Or.1985); *Lomboy v. United States,* 604 F.Supp. 490, 494 (E.D.Pa.1985).

## III.
### FIRM'S PRACTICE

7 C.F.R. § 278.6(e)(3) provides:
The FNS regional office shall:

Disqualify the firm for 3 years if it is to be the first sanction for the firm and the evidence shows that:

(i) It is *the firm's practice* to commit violations such as *the sale of common nonfood items in amounts normally found in shopping baskets* and the firm was previously advised of the possibility that violations were occurring and of the

possible consequences of violating the regulations.... (Emphasis added)

7 C.F.R. § 271.2 defines "firm's practice" as the "usual manner" in which personnel of a firm or store accept food coupons as shown by the actions of the personnel at the time of investigation.

As previously found by this Court, none of the ineligible items in the six transactions negotiated by the FNS investigation amounted to 30% of the overall purchases; and that purchases as evidenced by FNS's exhibits E and F are "clear violations" only because a "major item" was involved, namely, chewing tobacco. Moreover, the record also discloses that there was one complete refusal and two partial refusals to sell ineligible items. Significantly, FNS made no finding regarding the *"firm's intent"* to violate the regulations as required under 7 C.F.R. § 278.6(d).[6] See, *Plaid,* 612 F.Supp. 685. Given these circumstances, this Court is unable to find that this record supports FNS's conclusion that it was Sims' "practice" to violate the food stamp regulations.

### IV.
### COMPARABLE CASE—LITTLE JIM'S INC. NO. 11

Section 1210(d) of FNS Handbook 318 provides:

D *Comparable Cases.* After completing a thorough review of the case and preparing the explanatory notes ... the regional [director] shall review the comparable case file and select two previously decided cases which are essentially similar to the case under consideration. The regional [director] shall maintain a file of previous final determinations.... The determination of the regional [director] as to the period of disqualification which is appropriate in an investigative case should be in agreement with determinations reached in selected comparable cases....

---

**6.** Section 278.6(d) of 7 CFR provides:

(d) *Basis for determination.* The FNS regional office making a disqualification or penalty determination *shall consider:* (1) The nature and scope of the violations committed by personnel of the firm, (2) any prior action

taken by FNS to warn the firm about the possibility that violations are occurring, and (3) any other evidence that shows *the firm's intent to violate the regulations.* (Emphasis added)

Factors to be considered in selecting comparable cases are:

1. Nature and extent of the violations;

2. Level of responsibility of participants in the violations; and

3. Extent of previous compliance action.

In this proceeding, FNS selected "Little Jim's Inc. # 11, Oklahoma City, Oklahoma" as the comparable case, in which FNS imposed a sanction of disqualification for a period of three years, thus, justifying the sanction assessed against Sims Enterprise because of the alleged similarity between the two cases.

However, after carefully considering the facts in "Little Jim's Inc.", this Court is persuaded that the facts in "Little Jim's Inc." are not comparable to facts in this action. Moreover, "Little Jim's Inc." demonstrates clearly the arbitrariness of the disqualification imposed against Sims. For example, FNS, in imposing a disqualification for three years, found that "Little Jim's Inc." had committed five clear violations by selling ineligible items to investigators in which "over 40 percent [of the merchandise sold to investigators] was ineligible including a carton of beer", a can opener, a pizza cutter and a spatula; that the firm had been previously advised of the possibility that violations were occurring and of the possible consequences of violating the regulations; and that another store owned by "Little Jim's" had been disqualified for one year as a result of discounting food stamps for cash. Moreover, on February 18, 1982, approximately twenty-seven (27) months before the imposition of the three years disqualification period relied upon by FNS as a comparable sanction, "Little Jim's" was "issued an official warning letter" for clear violations of the regulations by receiving stamps for ineligible items.

The record also discloses that FNS, as far back as March 13, 1981, expressed its suspicion that "Little Jim's" was abusing the Food Stamp Program. For example, FNS's Administrative Review Division advised "Little Jim's, Inc." in its May 22,

1984, letter approving the disqualification for three years:

These investigative findings illustrate a substantial degree of noncompliance with Food Stamp Program rules and regulations in the operation of your business. Considering the repetitiveness of the violative sales and the volume of ineligible merchandise included in them, the transactions cannot be reasonably attributed to simple oversight by store personnel, nor can they be reasonably viewed as exceptions to the firm's normal sales practices. On the contrary, all circumstances of the violations portray them as representative of the overall food stamp business being regularly and routinely conducted by your firm at the time of investigation.

In further assessing the propriety of the penalty at issue in this case, I have noted in the record that prior to the time of investigation, USDA had made specific attempts to obtain this firm's compliance with program rules on a voluntary basis. In this regard, *the record shows that the firm had previously been visited on numerous occasions by representatives of the USDA office in Oklahoma City*, at which times Food Stamp Program requirements were discussed in detail with you and other management personnel. The purpose of these contacts was to ensure a thorough understanding of program rules, to emphasize the necessity for the firm's compliance therewith, and to make management personnel fully aware of established penalties for noncompliance.

The record also shows that in order to further emphasize USDA's concern about the firm's compliance with program rules, the most recent such visit was followed up by a certified letter issued to you by the Oklahoma City office on March 13, 1981. . . .

The record further shows that you were issued an official warning letter by USDA on February 18, 1982. This warning letter was prompted by investigative disclosures of certain violative sales by store personnel of Little Jim's Inc. No.

11. From these records, it is evident that prior to the occurrence of the program violations now at issue, USDA had made very reasonable efforts in seeking this firm's voluntary compliance with program regulations. It is equally evident, however, that such efforts were not availing of that end, since investigation subsequently disclosed repeated violations by store personnel.

## V.
## IN SUMMARY

 1. The evidence in this record is insufficient to find that it was Sims' practice to violate the Food Stamp Program Regulations; and,

2. FNS did not properly apply its Regulation in this proceeding in the following respects:

(a) Failure to make a finding regarding the "firm's intent" to violate the regulations.

(b) Failure to give "[s]pecial emphasis to the regulation dealing with the *alleged or suspected* violation" as opposed to a general comment on a variety of regulations in FNS's letter of October 1, 1984. In other words, FNS's warning letter of October 1, 1984, was not specific.

(c) Use of "Little Jim's Inc.", as a comparable case in order to justify the three years disqualification imposed, when in fact, "Little Jim's" is not only incomparable, but borders egregiousness when compared with Sims' case.

(d) In computing the ratio between ineligible and eligible items purchased, FNS applied a rule which provides that "ineligible items of the same kind and brand, sold in the same transaction, shall be counted as one item" across the board resulting in a percentage for ineligible in excess of 30% in each transaction.

3. This is Sims' first sanction.

 4. The three years disqualification imposed is unwarranted in law and, therefore, arbitrary and capricious.

Accordingly, the Court concludes that Sims shall be sent a warning letter because, in the opinion of this Court, the violations are too limited to warrant a disqualification. See, 7 C.F.R. § 278.6(e)(7). The three years disqualification is reversed and vacated and FNS is ordered to send Sims Enterprise, Inc. a warning letter pursuant to 7 C.F.R. § 278.6(e)(7).[7]

IT IS SO ORDERED this 5th day of January, 1988.

---

7. Under 7 C.F.R. § 279.10(c), this Court is authorized to "enter a judgment or order which it determines is in accordance with the law and the evidence", upon determining that defendant's action is invalid.